**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**THINK ACHIEVEMENT CORP.,**
**et al., Defendants,**

and

**Linda Tankersley, Relief Defendant.**

No. 2:98–CV–12–TS.

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 18, 2000.

Gregory A. Ashe, Federal Trade Commission, Washington, DC, for plaintiff.

Gregory J. Sarkisian, Sarkisian and Fleming, Portage, IN, Nick J. Thiros, Cohen and Thiros, Merrillville, IN, for defendants.

## MEMORANDUM OF DECISION AND ORDER

SPRINGMANN, United States Magistrate Judge.

This matter is before the Court on a Motion for Summary Judgment filed by the Plaintiff, the Federal Trade Commission ("Commission"), on June 8, 1999, against the corporate Defendants, Think

Achievement Corp., National Service, Inc., The Answering Service, Inc., The Rosewood Group, New Age Advertising Corp., H.D. Davidson Advertising Corp., Career Advancement Corp., and Information Delivery Systems, Inc. (collectively, "Corporate Defendants"), the individual Defendant William H. Tankersley ("Tankersley"), and the Relief Defendant Linda Tankersley. The Defendant, Tankersley, and Linda Tankersley, filed their Response on August 8, 1999. The Plaintiff filed its Reply on September 20, 1999.

On September 29, 2000, the Court granted the Plaintiff's Motion for Summary Judgment in part and indicated that the Court would issue a separate Memorandum and Order on damages, including the issue of fees. The Court's September 29, 2000, Memorandum and Order are incorporated herein. For the following reasons, summary judgment is GRANTED as to the remaining portions of the Plaintiff's Motion for Summary Judgment.

### MATERIAL FACTS

Managers and employees of the Corporate Defendants, who worked for the Defendants at various times and for various terms between 1991 and 1998, testified as follows regarding what percentage of the Corporate Defendants' business involved the marketing and sales of postal materials as opposed to non-postal materials: the vast majority of sales (between 90% and 95%) were for postal programs; more postal than anything else; the other materials were not our main thing we did there all the time; the postal employment program was the primary product sold; 90% postal; a large majority of sales from January of 1996 to January of 1998 was of postal materials; 99% postal in 1996 and 1997; we did not do sales of other materials a lot; we mainly did postal; and by 1994, more postal than anything else.[1] SJ Ex. 10 ¶ 4; SJ Ex. 13 at 144; SJ Ex. 16 at 196, 201; SJ Ex. 19 at 250; SJ Ex. 20 at 279; SJ Ex. 24 at 349; SJ Ex. 31 at 476–77. *See also* SJ Ex. 38 at 20, 44; SJ Ex. 39 at 70–71. Thus, during the course of their operation, at least ninety percent of the Corporate Defendants' business involved the marketing and sales of postal materials.

During the course of their operation, the Defendants had gross revenues of at least $34,752,592. *See* Pl.'s Mot. for Summ. J. at 41–44; Pl.'s Motion for Default J., filed Dec. 30, 1998, at Ex. 1 ¶ 8, Attach. C, D, E, and F; Id. Ex. 2 ¶ 4. Of this amount, approximately $31,277,333 was derived from the sale of the Defendants' postal materials.[2] Pl.'s Motion for Default J.,

1. Based on the computer database of credit card sales for 1996–1998, which was obtained from the Defendants' premises, the Commission determined that approximately two percent of the Defendants' revenues was derived from the sale of non-postal related materials. See Pl.'s Mot. for Summ. J. at 43; Pl.'s Mot. for Default J., filed Dec. 30, 1998, at Ex. 2 ¶ 5. Citing testimony of managers and employees, the Defendants argue that the two percent figure does not properly apply to the early years of operation for the Corporate Defendants when the marketing and sales of postal materials represented a smaller percentage of their business. Def.s' Answer Br. in Response to Pl.'s Mot. for Summ. J. at 80–82. The Defendants do not, however, indicate what percentage of their overall business involved postal materials, and their records do not provide such information. Furthermore, where necessary information is lacking to calculate damages with certainty, "[t]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir.1997) (internal quotation marks and citation omitted).

2. The Commission contends that approximately $34,057,540 was derived from the sale of the Defendants' postal materials. Pl.'s Mot. for Summ. J. at 43; Pl.'s Mot. for Default J., filed Dec. 30, 1998, at Ex. 2 ¶ 5. The Commission arrived at the $34,057,540 figure by reducing by two percent the $34,752,592

filed Dec. 30, 1998, at Ex. 2 ¶ 5. *See also* SJ Ex. 10 ¶ 4; SJ Ex. 13 at 144; SJ Ex. 16 at 196, 201; SJ Ex. 19 at 250; SJ Ex. 20 at 279; SJ Ex. 24 at 349; SJ Ex. 31 at 476–77; SJ Ex. 38 at 20, 44; SJ Ex. 39 at 70–71. Considering that the Defendants' refund rate was approximately 10%, they would have paid out approximately $3,127,733 in refunds. *See* Pl. Mot. for Default J. at Ex. 2 ¶ 6.

## ANALYSIS

The Commission has brought this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to secure injunctive relief against the Corporate Defendants, Tankersley, and Linda Tankersley because of unfair and deceptive acts and practices that violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Section 13(b) plays an important role in enabling the Commission to enforce consumer protection laws and is used by the Commission to pursue violations of Section 5 of the FTC Act. As indicated in the Court's September 29, 2000, Memorandum and Order, the Corporate Defendants and Tankersley engaged in deceptive practices in violation of Section 5 of the FTC Act.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." A violation of Section 5 of the FTC Act has been found to be such a proper case. *See FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1027–28 (7th Cir.1988). The authority to grant a permanent injunction includes the authority to order any other ancillary equitable relief necessary to effectuate the exercise of the granted powers. *FTC v. Febre,* 128 F.3d 530, 534 (7th Cir.1997); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571–72 (7th Cir.1989); *World Travel,* 861 F.2d at 1026.

### A. Permanent Injunctive Relief

■ The Commission has requested that the Court grant a permanent injunction against the Corporate Defendants and Tankersley. Section 13(b) of the FTC Act authorizes the granting of permanent injunctions to prevent defendants from engaging in deceptive business practices in violation of the FTC Act. *Febre,* 128 F.3d at 534; *World Travel,* 861 F.2d at 1027–28. "A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 132, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *NLRB v. Express Publ'g Co.,* 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941). The breadth of the injunction must depend upon the circumstances of the particular case, "the purpose being to

---

figure, which represents the total revenue taken in by the Defendants between 1991 and 1998. See Pl.'s Mot. for Summ. J. at 43; Pl.'s Mot. for Default J., filed Dec. 30, 1998, at Ex. 2 ¶ 5. The Defendants urge that this calculation is erroneous (because Indiana incarnation of Career Advancement is included in the calculation) and is not supported in the record (because the two percent figure does not accurately represent sales during the early years of the Defendants' operation).

The Court notes that, in some years, the Corporate Defendants apparently did not file tax returns and that Tankersley asserted his Fifth Amendment privilege when asked about the tax returns of the Corporate Defendants. The Court's ability to calculate accurately the revenues from the sale of postal materials is severely limited, in large part due to the Corporate Defendants' and Tankersley's actions or omissions. The Court, therefore, must calculate the revenue by relying on testimony, available documents, information in the computer database, and rough approximations.

prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts ... found to have been committed ... in the past." *Express Publ'g,* 312 U.S. at 436–37, 61 S.Ct. 693. Courts in equitable actions may enjoin otherwise lawful conduct to ensure that the final relief ordered is effective. *See United States v. Loew's, Inc.,* 371 U.S. 38, 53, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) ("Some of the practices which the Government seeks to have enjoined with its requested modifications are acts which may be entirely proper when viewed alone. To ensure, however, that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined."); *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th Cir.1994) ("The proper scope of an injunction is to enjoin conduct which has been found to have been pursued or is related to the proven unlawful conduct."); *United States v. Holtzman,* 762 F.2d 720, 726 (9th Cir.1985) ("[F]ederal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct."); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 390 (5th Cir.1977) ("In fashioning relief against a party who has transgressed the governing legal standard, a court of equity is free to proscribe activities that, standing alone, would have been unassailable."). A "court's power to grant injunctive relief survives discontinuance of the illegal conduct," and because the "purpose is to prevent future violations," injunctive relief is appropriate when there is a "cognizable danger of recurrent violation, something more than the mere possibility." *United States, v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Once a violation is demonstrated, all that

need be shown is that "there is some reasonable likelihood of future violations," and past unlawful conduct is "highly suggestive of the likelihood of future violations." *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979). In deciding whether to issue an injunction in light of past violations, courts should consider factors such as the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. *SEC v. Blatt,* 583 F.2d 1325, 1334 & n. 29 (5th Cir.1978). *See also SEC v. Posner,* 16 F.3d 520, 521–22 (2d Cir.1994), cert. denied, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995) (barring defendants from serving as officers or directors of any public company for past violations and concerns regarding future violations of securities laws); *SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1193 (9th Cir.1998) (barring a defendant from serving as an officer or director of a publicly traded corporation for violations of securities laws).

■ Defendants may be enjoined from making misrepresentations or false representations. *See Goodman v. FTC,* 244 F.2d 584, 595–96, 598–600 (9th Cir.1957). Reasonable fencing-in provisions are appropriate to prevent defendants from engaging in illegal practices. *See FTC v. Colgate–Palmolive Co.,* 380 U.S. 374, 395, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) ("The Commission is not limited to prohibiting the illegal practices in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some reasonable fencing in.") (internal quotation

marks and citations omitted); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir.1982) (reasonable "[f]encing-in provisions serve to 'close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity' ") (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 (1952)). Courts may order record-keeping and monitoring to ensure compliance with a permanent injunction. *See, e.g., FTC v. SlimAmerica, Inc.*, 77 F.Supp.2d 1263, 1276 (S.D.Fla. 1999) (holding that record-keeping and monitoring provisions were appropriate to permit the Commission to police the defendants' compliance with the order); *FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 753–54 (N.D.Ill.1992) (indicating that monitoring by the Commission may be necessary to ensure adequate compliance); *FTC v. Sharp*, 782 F.Supp. 1445, 1456–57 (D.Nev. 1991) (judgment included monitoring provisions).

■ Considering the fact that preliminary injunctive relief has already been ordered against the Defendants in this cause, the Court now determines, under the circumstances of this case, that a permanent injunction is necessary and appropriate to protect consumers. Although the Corporate Defendants are now defunct, the Court finds that, given the Corporate Defendants' and Tankersley's extensive and prolonged engagement in fraudulent, deceptive trade practices, the failure of prior enforcement efforts in requiring lawful activity and stopping unlawful activity, and the likelihood of future violation, there is a cognizable danger that, in the absence of a nationwide injunction enjoining the Corporate Defendants and Tankersley, they will continue to violate the law and thus that a permanent injunction is necessary to protect the public from further violations of the FTC Act. It is appropriate that the Corporate Defendants and Tankersley be permanently restrained from engaging in the businesses of telemarketing and marketing career advisory goods or services and from assisting others engaged in the businesses of telemarketing and marketing career advisory goods or services. It is also appropriate that the Corporate Defendants and Tankersley be prohibited from making various misrepresentations about career advisory goods or services, or any other goods or services, and from selling their customer lists. In order to ensure the enforcement of this Order, the Court finds it appropriate to require the Corporate Defendants and Tankersley to maintain records for five years, to require Tankersley to notify the Commission of any changes in his employment or residence status, to permit the Commission access to the Corporate Defendants' and Tankersley's offices to inspect records and interview employees and to pose as consumers to monitor representations, and to allow the Commission to monitor the Corporate Defendants' and Tankersley's compliance with the Order.

## B. Equitable Monetary Relief

The Commission has also requested that the Court order the Corporate Defendants and Tankersley to make restitution by repaying the money they made from their fraudulent, deceptive business enterprise. Based upon the corporate tax returns of several Corporate Defendants, a computer database containing information on customer payments and refunds, and testimony of managers and employees of the Corporate Defendants, the Commission has argued that the net consumer injury caused by the Defendants is at least $30,651,786 and urged that the Court order the Corporate Defendants and Tankersley to be held liable for equitable monetary relief in this amount. Pl.'s Mot. for Summ. J. at 41–44; Pl.'s Mot. for Def. J. at Ex. 1 ¶ 8, Att. C, D, E, and F; Pl.'s Mot. for Def. J. at Ex. 2 ¶ 4. The Commission contends that this amount is a reason-

able approximation of the amount of consumer net losses during the course of the Defendants' fraudulent scheme. In response, the Corporate Defendants and Tankersley contend that the Commission's calculation is erroneous and not supported by the record. The Corporate Defendants and Tankersley argue first that, because the Indiana incarnation of Career Advancement is not a party in this suit, its revenues should not be included in the calculation, and second that the record demonstrates that the sale of non-postal materials represented a greater portion of their enterprise than the two percent figure adopted by the Commission in calculating monetary equitable relief.

In its September 29, 2000, Memorandum and Order, the Court found that the Corporate Defendants, including Career Advancement (Indiana), operated as a common enterprise. The Court further found that Tankersley participated in the fraudulent scheme, had the authority to control and did in fact control Career Advancement (Indiana) and the Corporate Defendants, and had knowledge of their deceptive and fraudulent business practices. Thus, the Corporate Defendants are each liable for the deceptive acts and practices of the others, and Tankersley, as an individual, is liable.

Under Section 13(b) of the FTC Act, the power to grant ancillary equitable relief includes the power to order equitable monetary relief for consumer redress through repayment of money, restitution, disgorgement of unjust enrichment, or rescission. *Febre*, 128 F.3d at 534; *Amy Travel*, 875 F.2d at 571–72. *See also FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 469 (11th Cir.1996). Corporate and individual defendants may be held jointly and severally liable for the total amount of consumer injury. *See, e.g., Amy Travel*, 875 F.2d at 570; *Sharp*, 782 F.Supp. at 1449–54; *FTC v. Magui Publishers, Inc.*, 1991–1 Trade

Cas. (CCH) ¶ 69,425 at 65,729 (C.D.Cal. Mar.28, 1991).

█ In determining the amount of equitable monetary relief, the amount of restitution equals the amount paid by the consumer victims of an illegal scheme, less any amounts previously returned to the victims. *See Febre*, 128 F.3d at 536; *US Sales*, 785 F.Supp. at 753. *See also GEM Merchandising*, 87 F.3d 466 (affirming an award of damages as calculated by consumers' losses); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–07 (9th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994) (stating that restitution is amount of enrichment received); *Amy Travel*, 875 F.2d at 570 (affirming restitution award equal to the amount consumers paid for travel certificates); *FTC v. Renaissance Fine Arts, Ltd.*, 1995–2 Trade Cas. (CCH) ¶ 71,086 at 75,194 (N.D.Ohio Aug.10, 1995) (stating that generally the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid); *FTC v. Silueta Distribs., Inc.*, 1995–1 Trade Cas. (CCH) ¶ 70,918 at 74,099 (N.D.Cal. Feb.24, 1995) (awarding restitution in full amount consumers paid). Once the Commission shows that its calculations "reasonably approximate[ ] the amount of consumers' net losses," the burden "shifts to the defendants to show that those figures were inaccurate." *Febre*, 128 F.3d at 535 (citations omitted). Moreover, where necessary information is lacking to calculate damages with certainty, "[t]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (internal quotation marks and citation omitted). This measure of restitution applies even if the product purchased by consumers has some value. *See Figgie Int'l*, 994 F.2d at 606 (noting that "[c]ourts have previously rejected the contention 'that restitution is available only when the

goods purchased are essentially worthless.'") (citation omitted). This measure of restitution applies even if the Commission cannot identify all the consumers entitled to restitution. *Febre*, 128 F.3d at 537. "To ensure that defendants are not unjustly enriched by retaining some of their unlawful proceeds by virtue of the fact that they cannot identify all consumers entitled to restitution and cannot distribute all the equitable relief ordered to be paid," the Commission may direct equitable disgorgement of the excess money to the United States Treasury. *Febre*, 128 F.3d at 537. *See also SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985) (funds remaining after all claims have been satisfied shall revert to the U.S. Treasury).

 A court may grant equitable relief against a relief defendant against whom no wrongdoing is alleged if it is established that the relief defendant possesses property or profits illegally obtained and the relief defendant has no legitimate claim to them. *SEC v. Cherif*, 933 F.2d 403, 414 & n. 11 (7th Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992); *SEC v. Egan*, 856 F.Supp. 401, 402 (N.D.Ill.1993). *See also SEC v. Cross Fin. Serv., Inc.*, 908 F.Supp. 718, 730–32 (C.D.Cal.1995); *SEC v. Antar*, 831 F.Supp. 380, 398–99 (D.N.J.1993). As important as it is to disgorge the wrongdoer of ill-gotten gains in order to deprive the wrongdoer of his unjust enrichment and to deter others from violating the law, "it is just as important to discourage illegal conduct by taking the proceeds of that illegality from those who have given no current value for the ill-gotten gains that have been turned over to them (even though they themselves have not directly engaged in the illegal activity)." *Egan*, 856 F.Supp. at 402 & n. 3. Furthermore, "[a]s between the [relief] defendant[ ] and the victims of fraud, equity dictates that the rights of the victims should control." *Antar*, 831 F.Supp. at 402–03. In granting relief against relief defendants and ordering disgorgement of profits illegally obtained, courts may employ the doctrines of constructive trust[3] and unjust enrichment[4] "where, rightfully or wrongfully, a party has obtained property that unjustly enriches him." *Id.* (internal quotation marks and citation omitted). *See also Rollins v. Metropolitan Life Ins. Co.*, 912 F.2d 911, 914 (7th Cir.1990) (under Indiana law, courts have imposed a constructive trust where a duty has been breached and "a third party unjustly enriched as a result of that breach, even absent wrongdoing by the party unjustly enriched," and "equity may collect proceeds from an innocent party in order to protect the equitable rights of those who have suffered the wrong"); *Egan*, 856 F.Supp. at 402 ("To be sure, Relief Defendants may not have been directly culpable in the ... violations, but what the [Commission] seeks to have them disgorge are the benefits that they derived from the violations by the culpable defen-

---

**3.** "[C]onstructive trust is a creature of state law." *FTC v. Crittenden*, 823 F.Supp. 699, 703 (C.D.Cal.1993), *aff'd without op.*, 19 F.3d 26, 1994 WL 59803 (9th Cir.1994). Under Indiana law, a constructive trust arises in cases where the underlying transaction involved is tainted by fraud, whether actual or constructive, and a court will construct a trust as required by equity and good conscience in order to do justice to the parties affected by the fraudulent transaction. *Brown v. Brown*, 235 Ind. 563, 135 N.E.2d 614, 616–17 (1956). Actual intent to defraud is not necessary for the creation of a constructive trust. *Id.* at 616.

**4.** To recover under the doctrine of unjust enrichment, a plaintiff must establish that the defendant was enriched and that " 'the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff.' " *Antar*, 831 F.Supp. at 402 (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986)).

dants. And those benefits—the unjust enrichment—are what trigger the application of the doctrine of constructive trust as a 'device for preventing unjust enrichment.' ") (quoting *American Nat'l Bank & Trust Co. v. United States*, 832 F.2d 1032, 1035 (7th Cir.1987)).

■ In order to satisfy an award of equitable monetary relief, a court may order the repatriation of assets. *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir.1999) (affirming a finding of civil contempt against defendants for refusing to repatriate funds after the court in a temporary restraining order and preliminary injunction ordered the defendants to "transfer to the territory of the United States all funds, documents and assets in foreign countries held either: (1) by them; (2) for their benefit; or (3) under their direct or indirect control, jointly or singly."); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir.1989) (affirming an injunction ordering a defendant to transfer foreign funds to an institution within the district of Nevada); *SlimAmerica*, 77 F.Supp.2d at 1277 (ordering in a permanent injunction the repatriation of assets).

■ Furthermore, a federal court's authority to grant ancillary relief includes the authority to appoint a receiver. *See FTC v. American Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512–13, 1514 (9th Cir.1987); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432–33 (11th Cir.1984); *FTC v. Windermere Big Win Int'l* [1999–2 Trade Cases ¶ 72,647], No. 98C8066, 1999 WL 608715, at * 1 (N.D.Ill. Aug.5, 1999); *Slimamerica*, 77 F.Supp.2d at 1277; *FTC v. Wilcox*, 926 F.Supp. 1091, 1106 (S.D.Fla. 1995); *FTC v. Int'l Computer Concepts* [1994–2 Trade Cases ¶ 70, 798], No. 94CV1678, 1994 WL 730144, at * 17 (N.D.Ohio Oct.24, 1994). *Cf. Commodity Futures Trading Comm'n v. Chilcott Portfolio Management*, 713 F.2d 1477, 1480,

1482 (10th Cir.1983) (receiver may be directed to take custody and control of all assets and records, to prevent further dissipation of assets, and to prosecute and defend court actions).

■ Considering the facts of this case and the governing body of law, the Court finds it appropriate to order equitable monetary relief for consumer redress. The Court finds that the net consumer injury, the total revenue taken in by the Defendants from the sale of postal materials less refunds paid to consumers, is $28,149,600 and that the appropriate amount of restitution is the entire amount of net consumer injury caused by the Defendants' fraudulent scheme. The Court, therefore, will enter a judgment for equitable monetary relief against the Corporate Defendants and Tankersley in the amount of $28,149,600 and will hold the Corporate Defendants, including Career Advancement (Indiana), and Tankersley jointly and severally liable.

■ Linda Tankersley received significant sums of money and other property that were derived from the Defendants' fraudulent activities. Much of the profits Tankersley received, directly or indirectly, from the Corporate Defendants was transferred into various mutual fund accounts held by or for Linda Tankersley and himself. The evidence demonstrates that between 1992 and the beginning of 1998 at least $3,158,000 of the Defendants' ill-gotten gains was transferred into mutual fund accounts owned by the Linda S. Tankersley and William H. Tankersley Revocable Trusts. The history of activity in Linda Tankersley's own bank account at Centier Bank reflects the transfer of money from the Corporate Defendants into the account and withdrawals and other debits involving the business affairs of the Corporate Defendants and Tankersley. Although her account was virtually activity-less for near-

ly a year, her account had significant activity beginning a few days before the Commission named Tankersley as a defendant in this action. In a span of less than two weeks, over $600,000 moved through Linda Tankersley's Centier account, with approximately $200,000 remaining when the Court imposed a freeze over all assets subject to Tankersley's control. Thus, because monies received by Linda Tankersley derived from the proceeds of a fraudulent scheme, equity and good conscience will not permit her to keep any monetary benefit she received from the fraudulent enterprise. Equity requires that the Court construct a trust for the benefit of the defrauded consumers and that she disgorge her unjust enrichment. Accordingly, the Court imposes a constructive trust over all assets, wherever located, that are controlled by Linda Tankersley, both singly and jointly with Tankersley, and that are derived from the Defendants' fraudulent scheme and orders her to disgorge those assets.

The Court directs Tankersley and Linda Tankersley to turn over to the Receiver all assets held by them, on their behalf, for their benefit, or in trust by or for them. The Court orders the Corporate Defendants, Tankersley, and Linda Tankersley to repatriate to the United States and turn over to the Receiver all assets in foreign countries (up to the judgment amount). The Court also directs any third party holding assets of the Corporate Defendants, Tankersley, or Linda Tankersley to turn those assets over to the Receiver. In order to partially satisfy the monetary judgment, the Court orders the Receiver to turn over to the Commission the assets in the receivership estate (less Court-approved fees and expenses). The Commission shall establish a redress fund for distribution of money as restitution to the injured consumers. After consumer redress claims have been satisfied, any monies from this redress fund that are not distributed to consumers may revert to the United States Treasury.

### C. Fees and Costs

The Defendants have requested that this Court allow the payment of fees and costs out of the frozen assets. The Commission has objected urging that the Defendants are not entitled to these funds and that their claim to these funds is inferior to the equitable rights of the victims of the fraudulent and deceptive scheme to have redress.

Although defendants are not entitled to the payment of attorney's fees out of frozen assets, courts in this circuit, in their discretion, have allowed such payment of reasonable attorney's fees. *See, e.g., Amy Travel,* 875 F.2d at 575–76; *World Travel,* 861 F.2d at 1032; *Windermere Big Win,* 1999 WL 608715, at *6. Thus, this Court has discretion to release frozen funds for attorney's fees and to set limits upon their release.

The Court finds it appropriate in this case to allow the payment of reasonable attorney's fees and expenses out of the funds held in trust by the law firm of Sarkisian and Fleming.

### CONCLUSION

For all the foregoing reasons, the Plaintiff's Motion for Summary Judgment is hereby GRANTED IN REMAINING PARTS. The Court enters Final Judgment for the Plaintiff and against the Defendants, issues a permanent injunction against the Defendants, awards consumer redress in the amount of $28,149,600, appoints a Permanent Receiver, and allows the payment of fees and costs out of the frozen assets. A Motion for Summary Judgment filed by the Cross–Claimant, Steven F. Stucker, remains pending before the Court.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon each of Think Achievement Corp., National Answering Service, Inc., New Age Advertising Corp., H.D. Davidson Advertising Corp., The Answering Service, Inc., The Rosewood Group, Career Advancement Corp., and Information Delivery Systems, Inc. (collectively, the "Corporate Defendants") and William H. Tankersley ("Tankersley"), and their officers, agents, servants, employees, and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

Entry of this Order is in the public interest.

## DEFINITIONS

For purposes of this Order, the following definitions shall apply:

1. "Business of marketing career advisory goods or services" means any activity involving attempts to induce consumers to purchase any item, product, good, or service represented to assist consumers in obtaining employment, by any means including advertisements in any medium and/or the business of telemarketing.

2. "Business of telemarketing" means any activity (including, but not limited to, initiating or receiving telephone calls, managing others who initiate or receive telephone calls, operating an enterprise that initiates or receives telephone calls, owning an enterprise that initiates or receives telephone calls, or otherwise participating as an officer, director, employee, independent contractor, or consultant in or for an enterprise that initiates or receives telephone calls) that involves attempts to induce consumers to purchase any item, product, good, service, investment, partnership interest, trust interest, or other beneficial interest, to make a charitable contribution, or to enter a contest for a prize, by means of telephone sales presentations, either exclusively or in conjunction with the use of other forms of marketing; provided, however, that the term "business of telemarketing" shall not include transactions that are not completed until after a face-to-face contact between the seller or solicitor and the consumers solicited, and the consumer is not required to pay or authorize payment until after such a presentation.

3. "Assisting others" means providing any of the following goods or services to any person or entity: (a) performing customer service functions, including but not limited to receiving or responding to consumer complaints; (b) formulating, providing, or arranging for the formulation or provision of, any telephone sales script or any other written marketing material; (c) providing names of, or assisting in the generation of, potential customers; (d) performing marketing services of any kind; or (e) acting as an officer or director of a business entity.

4. "Postal Service" means the United States Postal Service, an independent agency within the executive branch of the Government of the United States.

## I. PROHIBITED BUSINESS ACTIVITIES

IT IS ORDERED that, in connection with the advertising, promotion, offer for sale, or sale of any item, product, good, service, or investment, partnership interest, trust interest, or other beneficial interest, the Corporate Defendants, Tankersley, and their officers, agents, servants,

employees, and attorneys, and all persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby permanently restrained and enjoined from:

A. falsely representing, expressly or by implication, that an employment program is affiliated with or endorsed by any employer, including, but not limited to, the Postal Service;

B. falsely representing, expressly or by implication, that permanent positions with any employer, including, but not limited to, the Postal Service, are available in particular geographic areas, and that such employer is offering examinations for such positions;

C. falsely representing, expressly or by implication, that consumers who purchase and review materials are likely to receive high scores on any employment examinations, including, but not limited to, any Postal Service examinations;

D. falsely representing, expressly or by implication, that consumers who purchase and review printed materials are likely to receive permanent positions with any employer, including, but not limited to, the Postal Service, within a short period of time;

E. falsely representing, expressly or by implication, the terms and conditions of any refund policy;

F. falsely representing, expressly or by implication, any material fact regarding employment with the Postal Service, employment with any federal, state, or local government agency, or any other type of employment;

G. falsely representing, expressly or by implication, any material fact regarding any item, product, good, service, investment, partnership interest, trust interest, or other beneficial interest sold or offered for sale; and

H. assisting others who violate any provision of sub-paragraphs A–G of this Paragraph I.

## II. BAN ON CERTAIN ACTIVITIES

IT IS FURTHER ORDERED that the Corporate Defendants and Tankersley are permanently restrained and enjoined from (A) engaging in the business of telemarketing and the business of marketing career advisory goods or services, and (B) assisting others who are engaged in the business of telemarketing or the business of marketing career advisory goods or services. Nothing in this Order shall be read as an exception to this paragraph.

## III. CONSUMER LISTS

IT IS FURTHER ORDERED that the Corporate Defendants and Tankersley, and their officers, agents, servants, employees, and attorneys, and all persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are permanently restrained and enjoined from hereafter selling, renting, leasing, transferring, or otherwise disclosing the name, address, telephone number, credit card number, bank account number, e-mail address, or other identifying information of any person who paid any money to any defendant, at any time prior to entry of this Order; provided, however, that the Corporate Defendants or Tankersley may disclose such identifying information, with the express written consent of the person whose information is disclosed, to a law enforcement agency or as required by any law, regulation, or court order.

## IV. RECEIVER

IT IS FURTHER ORDERED that the temporary receivership is transformed into a permanent receivership. The Temporary Receiver in this matter, J. Brian Hit-

tinger, is hereby named Permanent Receiver and retains the powers and rights set forth in the Temporary Restraining Order of January 15, 1998, and Appendix A. The Permanent Receiver thus has authority to take all appropriate steps to maximize the amount of funds available to the Commission for consumer redress, including but not limited to taking custody and control of assets identified during the course of this civil action and any other asset owned jointly by or held on behalf of, for the benefit of, or in trust by or for, Tankersley and Linda Tankersley; preventing dissipation of assets; prosecuting and defending court actions; proceeding with all necessary legal and diplomatic measures necessary to repatriate assets; and marshaling and disposing of assets as ordered by the Court. During the continuance of this receivership and beginning six months from the date the Receiver first turns over to the Commission assets from the receivership estate, the Receiver shall file with the Court at six month intervals an accounting of assets received into the receivership estate.

### V. MONETARY RELIEF

IT IS FURTHER ORDERED that:

A. Judgment is hereby entered against the Corporate Defendants and Tankersley, jointly and severally, in the amount of TWENTY–EIGHT MILLION ONE HUNDRED FORTY–NINE THOUSAND SIX HUNDRED DOLLARS ($28,149,600), with post-judgment interest at the legal rate, for equitable monetary relief, including but not limited to consumer redress, and for paying any attendant expenses of administering any redress fund. The monetary judgment set forth in this Paragraph V is enforceable against any asset owned jointly by or held on behalf of, for the benefit of, or in trust by or for, Tankersley and Linda Tankersley.

B. All amounts the Receiver marshals towards this sum shall be turned over to the Commission to be deposited into an account maintained by the Commission or its agent. Such funds shall be (1) distributed as redress to consumers, and/or (2) paid to the U.S. Treasury as equitable disgorgement, if such distribution is deemed impractical. If the Commission in its discretion determines that redress is practical, it shall submit to the Court for review and approval a plan for the disbursement of funds.

C. Defendant William Tankersley and Relief Defendant Linda Tankersley each are hereby required to furnish to the Receiver his or her social security number for the purpose of collecting any amount arising out of this Order.

D. This equitable monetary relief is solely remedial in nature and is not a fine, penalty, punitive assessment, or forfeiture.

### VI. TURNOVER OF FROZEN ASSETS

IT IS FURTHER ORDERED that

A. In order partially to satisfy the monetary judgment set forth in Paragraph V above, any law firm, financial or brokerage institution, escrow agent, title company, commodity trading company, business entity, or person, whether located within the United States or outside the United States, that holds, controls, or maintains accounts or assets of, on behalf of, or for the benefit of, any Corporate Defendant, Tankersley, or Linda Tankersley shall turn over such account or asset (except for the trust account of Sarkisian and Fleming under account number 517–548475) to the Receiver within ten (10) business days of receiving notice of this Order by any means, including but not limited to via facsimile.

B. In order to partially satisfy the monetary judgment set forth above, the Receiver is directed to turn over to the Commission within fifteen (15) business days of the date of entry of this Order all assets in the receivership estate less $300,000. The Receiver shall retain in the receivership estate the amount of $300,000 plus such additional assets that the Receiver is hereafter able to marshal. Such assets shall be used to pay reasonable attorney's fees and costs, as approved by this Court, which have been incurred since this Court's most recent granting of Defendants' petition for fees and cost in this civil suit. Such assets shall also be used to reimburse, upon application to and approval by the Court, the Receiver for his reasonable and necessary costs and expenses in administering and winding up the receivership estate. Upon termination of the receivership and final payment to the Receiver of all approved costs and expenses, the Receiver shall turn over to the Commission all remaining assets in the receivership estate.

C. In order to partially satisfy the monetary judgment set forth above, Tankersley and Linda Tankersley shall turn over to the Receiver within ten (10) business days of the date of entry of this Order title to all the real and personal property.

D. In order partially to satisfy the monetary judgment set forth in Paragraph IV above, each Corporate Defendant, Tankersley, and Linda Tankersley shall provide an accounting of, and repatriate and turn over to the Receiver, within ten (10) business days following the entry of this Order, all assets in foreign countries held either: (a) by such Corporate Defendant or Tankersley and Linda Tankersley, (b) for such Corporate Defendant's or Tankersley's and Linda Tankersley's benefit, or (c) under such Corporate Defendant's or Tankersley's and Linda Tankers-ley's direct or indirect control, jointly or singly, including but not limited to all assets placed in trust by, for, for the benefit of, on account of, or on behalf of any Corporate Defendant or Tankersley and Linda Tankersley.

## VII. RECORD KEEPING PROVISIONS

IT IS FURTHER ORDERED that, for a period of five years from the date of entry of this Order, the Corporate Defendants and Tankersley, in connection with any business where they are an officer, director, manager, or majority owner, are hereby restrained and enjoined from failing to have such business create and retain for a period of three years following the date of such creation, unless otherwise specified:

A. Books, records, and accounts that, in reasonable detail, accurately and fairly reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

B. Records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable; provided that the business subject to this sub-paragraph shall retain such records for a period of two years following the date of each such person's termination;

C. Records containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, for all consumers to whom such business has sold, invoiced, or shipped any goods or services;

D. Records that reflect, for every consumer complaint or refund request, whether received directly or indirectly or through any third party: (1) the consumer's name, address, telephone number, and the dollar amount paid by the consumer; (2) the written complaint or refund request, if any, and the date of the complaint or refund request; (3) the basis of the complaint, including the name of any salesperson complained against, and the nature and result of any investigation conducted concerning any complaint; (4) each response and the date of the response; (5) any final resolution and the date of the resolution; and (6) in the event of a denial of a refund request, the reason for the denial; and

E. Copies of all sales scripts, training materials, advertisements, or other marketing materials utilized; provided that copies of all sales scripts, training materials, advertisements, or other marketing materials utilized shall be retained for three years after the last date of dissemination of any such materials.

## VIII. COMPLIANCE REPORTS BY DEFENDANTS

IT IS FURTHER ORDERED that:

A. For a period of five years from the date of entry of this Order, Tankersley shall notify the Commission of the following: (1) any changes in his business address, business telephone number, residential address, or residential telephone number, within fifteen days of the date of such change; and (2) any changes in his employment status (including self-employment) within fifteen days of such change. Such notice shall include the name and address of each business that Tankersley is employed by, a statement of the nature of the business, and a statement of his duties and responsibilities in connection with the business or employment;

B. Within 120 days of the date of entry of this Order, Tankersley shall submit a written report to the Commission, signed under penalty of perjury, detailing his past and present efforts to comply with this Order;

C. For a period of five years from the date of entry of this Order, upon written request by a representative of the Commission, Tankersley shall submit written reports (under oath, if requested) and produce documents on fifteen days' notice with respect to Tankersley's compliance with this Order;

D. For the purposes of this Order, Tankersley shall, unless otherwise directed by the Commission's representatives, address all written communications to the Commission to:

Associate Director for Enforcement
Federal Trade Commission
600 Pennsylvania Avenue, NW, Room S–4302
Washington, DC 20580
Re: *FTC v. Think Achievement Corp.*, Matter No. X980009

E. For the purposes of this Paragraph VII, "employment" includes the performance of services as an employee, consultant, independent contractor, officer, or director.

## IX. ACCESS TO BUSINESS PREMISES

IT IS FURTHER ORDERED that, for a period of five years from the date of entry of this Order, for the purpose of determining compliance with this Order, the Corporate Defendants and Tankersley shall permit representatives of the Commission, within three business days of receipt of written notice from the Commission:

A. To access during normal business hours any office or facility storing docu-

ments of any business where each is an officer, director, manager, or majority owner. In providing such access, the Corporate Defendants and Tankersley shall permit representatives of the Commission to inspect and copy all documents relevant to their compliance with this Order and shall permit Commission representatives to remove such documents for a period not to exceed five business days so that the documents may be inspected, inventoried, and copied; and

B. To interview the officers, directors, and employees, including all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated as employees, consultants, independent contractors, or otherwise, of any business to which subparagraph A of this Paragraph VIII applies, concerning matters relating to compliance with the terms of this Order. The person interviewed may have counsel present.

## X. AUTHORITY TO MONITOR COMPLIANCE

IT IS FURTHER ORDERED that the Commission is authorized to monitor the Corporate Defendants' and Tankersley's compliance with this Order by all lawful means, including but not limited to the following:

A. The Commission is authorized, without further leave of court, to obtain discovery from any person in the manner provided by Chapter V of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 26–37, including the use of compulsory process pursuant to Fed.R.Civ.P. 45, for the purpose of monitoring the Corporate Defendants' and Tankersley's compliance with any provision of this Order;

B. The Commission is authorized to use representatives posing as consumers and suppliers to the Corporate Defendants and Tankersley, their employees, or any other entity managed or controlled in whole or in part by any Corporate Defendant or Tankersley, without the necessity of identification or prior notice; and

C. Nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b–1, to investigate whether the Corporate Defendants or Tankersley have violated any provision of this Order or Section 5 of the FTC Act, 15 U.S.C. § 45.

## XI. SERVICE OF ORDER BY DEFENDANTS

IT IS FURTHER ORDERED that, for a period of five years from the date of entry of this Order, the Corporate Defendants and Tankersley shall provide a copy of this Order to and obtain a signed and dated acknowledgment of receipt of same from each officer or director, each individual serving in a management capacity, all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated as employees, consultants, independent contractors, or otherwise, immediately upon employing or retaining any such persons for any business where each is an officer, director, manager, or majority owner.

## XII. FEES AND COSTS

IT IS FURTHER ORDERED that the Defendants file of record within ten (10) days from the date of entry of this Memorandum and Order an up-to-date petition identifying the reasonable attorney's fees and costs incurred since the last release of trust account monies for payment of attorney's fees and expenses through to the date of this Memorandum and Order. The Defendants are directed to redact their submission to remove reference to privileged or work product materials. The Commission shall have ten days from the

 

filing of the Defendants' petition to respond as to the necessity and reasonableness of the amounts claimed.

## XIII. RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes.